UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY D. MILLER, | ) | CASE NO. 3:12CV3064 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Timothy D. Miller ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

**I.**     **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for benefits on August 16, 2004 alleging disability beginning on November 3, 2002. Transcript ("Tr.") at p. 86-92. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 41. Plaintiff requested an administrative hearing, and on May 17,2007, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and Grace Gianforte, an impartial vocational expert ("VE"). Tr. at 689-730. On December 19, 2007, the ALJ issued a Decision denying benefits. Tr. at 675-681. Plaintiff appealed the Decision, and on May 19, 2010, the Appeals Council remanded the case to an ALJ because the record could not be located.  The Appeals Council remanded the case in order to give Plaintiff the opportunity for a new hearing and Decision.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

In the interim, Plaintiff filed a second set of applications on July 14, 2008. Tr. at 90-92, 661-667. The DIB application was granted beginning on December 20, 2007, with a notation that the earlier period remained on appeal before the Appeals Council. Tr. at 35, 166-167. The DIB award was reviewed subsequent to the allowance and was rescinded on March 2, 2009. Tr. at 36, 58-60, 169-171. Plaintiff requested reconsideration, but the claim was denied on April 7, 2009. Plaintiff requested a hearing, which was held on July 6, 2011 and where the applications were consolidated. Tr. at 37, 61-69. On September 22, 2011, the ALJ issued a Decision denying benefits with respect to all of the applications. Plaintiff appealed the Decision, but the Appeals Council denied review. Tr. at 7-9, 12.

On December 17, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On May 22, 2013, with leave of Court, Plaintiff filed a brief on the merits. ECF Dkt. #13. On June 19, 2013, Defendant filed a brief on the merits. ECF Dkt. #14. On July 5, 2013, Plaintiff filed her reply brief. ECF Dkt. #15.

On December 5, 2013, Plaintiff filed an amended notice of award. ECF Dkt. #17. In an undated Explanation of Determination, presumably issued with respect to a third set of disability applications, Defendant found that Plaintiff had established disability as of September 23, 2011, that is, the day after the Decision currently before the Court. ECF Dkt. #17-1. Defendant explained that "[b]y law [Defendant is] not allowed to invade a prior time period ruled on by an [ALJ]." *Id.* Accordingly, Plaintiff limited his appeal to an alleged disability period  beginning November 3, 2002 through September 23, 2011.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-eight years of age on the alleged onset date and fifty-seven years of age on the date of the hearing, suffered from bipolar disorder, which qualified as a severe impairment under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 19. The ALJ characterized Plaintiff's physical impairments, including his back pain, as non-severe impairments. Tr. at 19-21. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 ("Listings").  Tr. at 21-23.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: Plaintiff can only finger with the left hand frequently, and can perform work with few changes that is not fast-paced.  Plaintiff is also limited to work with an specific vocational preparation time[2] of 1-2.  Tr. at 23. The ALJ ultimately concluded that, although Plaintiff could not return to his past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of cleaner, warehouse worker, and sandwich maker  Tr. at 33.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be

---

[2]The Dictionary of Occupational Titles lists a specific vocational preparation time ("SVP") for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

-4-

### V.    ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ erred when he concluded that Plaintiff did not meet a listing based upon his bipolar disorder coupled with the fact that he lived in a group home following his onset date pursuant to a court order. Next, Plaintiff contends that the ALJ erred in formulating his RFC, because he did not include lifting limitations based upon Plaintiff's back problems and when he concluded that Plaintiff was capable of frequent fingering with his left hand. Finally, Plaintiff asserts that the ALJ failed to articulate good reasons for giving minimal weight to the opinion of Plaintiff's treating physician, Victoria Kelly, M.D.

### A.    Medical history

Plaintiff's first psychiatric admissions relating to his bipolar disorder occurred when he was in his forties. Tr. at 301. On March 1, 2000, Plaintiff was admitted to St. Luke's Hospital after mixing alcohol and pain medication following foot surgery. Tr. at 368. Plaintiff was hyper-talkative, agitated, and asked for pain medication relating to bilateral foot pain. He was sent to Rescue Crisis Center and transferred to the psychiatric department of Flower Hospital, where he denied that the incident was an attempted suicide. He agreed upon discharge to seek inpatient counseling for drug and alcohol abuse. Tr. at 361. He returned to Flower Hospital roughly one week later complaining of back pain and racing thoughts. Tr. at 361. During his consultation, he reported that he could lift five hundred pounds. He was diagnosed with bipolar type I with a recent manic episode without psychotic features. Plaintiff was assigned a Global Assessment of Functioning ("GAF") score[3] of thirty-five to forty. On August 25, 2000, Plaintiff was admitted to Flower Hospital after taking thirty Vicodin and engaging in an altercation with police. Tr. at 348.

---

[3]The GAF scale ranges from zero to ninety and is used by clinicians to indicate a patient's overall judgment of a person's symptom severity and/or functioning. Diagnostic and Statistical Manual of Mental Disorders--Fourth Edition (DSM-IV-TR) 32, 34 (4th ed., text rev., 2000). A GAF score between thirty-one and forty indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

Medical records reflect that Plaintiff was prescribed Deparkote, Prozac, Paxil, Zoloft, and Ativan, although he conceded that, with the exception of Paxil and Zoloft, he only continued the various medications for a month after they were prescribed.  Tr. at 301.  Plaintiff largely denied his illness, despite manic episodes, altercations with police, and "spending sprees." Tr. at 301.  Plaintiff reported that he typically increased his alcohol and drug use during manic episodes.

In April of 2002, seven months prior to his alleged November 3, 2002 onset date, Plaintiff was admitted to St. Charles Mercy Hospital for nine days after he experienced a manic episode. Tr. at 208-09, 210-11. Treatment notes establish that Plaintiff drove his car into a ditch and was combative with emergency room staff. Tr. at 210.  As a result of the incident, Plaintiff quit his sales job at a car dealership. Tr. at 268. Two days after being discharged from the hospital, Plaintiff drove his car to the car dealership and began revving his engine. Tr. at 295, 313. When the police arrived, Plaintiff drove away and a police chase ensued.  After Plaintiff damaged a fire engine and a police car during the chase, he was charged with felonious assault, vandalism, and failure to comply. Tr. at 295, 324. He was incarcerated for several months and medical staff at the jail prescribed Risperdal. Tr. at 324. Plaintiff responded immediately to the drug.  Ultimately, Plaintiff was determined to be not guilty by reason of insanity and he was committed to Northcoast Behavioral Healthcare on November 7, 2002. Tr. at 306, 324.

Upon admission to Northcoast, Julie Hartley, M.D., described Plaintiff's grooming and hygiene as good. Tr. at 325. He was alert and friendly, but had a flat affect. Tr. at 325. Plaintiff's insight was fair and his judgment good. His memory was only "slightly" impaired. Tr. at 325.  Dr. Hartley diagnosed a bipolar disorder and assigned a GAF score of 50. Tr. at 326.

On November 21, 2003, Dr. Hartley saw Plaintiff again for an annual comprehensive psychiatric exam. Tr. at 295-99.  Plaintiff exhibited a "good" mood and appropriate affect. Tr. at 298. Dr. Hartley observed that Plaintiff had done "very well" on Risperdal for the past year and "has not had any reappearance of unstable mood." Tr. at 298. Dr. Hartley opined that Plaintiff had a GAF

-6-

score of 60.[4] Tr. at 299. Plaintiff began performing janitorial work three days a week, eight hours a day in June of 2004.  Tr. at 699.

On July 16, 2004, Thomas Osinowo, M.D., discharged Plaintiff from Northcoast with a GAF score of 60. Tr. at 322. Dr. Osinowo noted that Plaintiff went to work promptly, and returned to the hospital as directed. Tr. at 322. Plaintiff's attention, concentration, insight, and cognitive function were all good. Tr. at 322. Dr. Osinowo discharged Plaintiff on a "conditional release," which included outpatient treatment, Tr. at 323, and living in a group home, Tr. at 227, pursuant to the court order.  At discharge, Plaintiff was prescribed Risperdal 2 mg., as well as prescriptions to treat high blood pressure, high cholesterol, and heartburn Tr. at 323.

On July 28, 2004, following his release from Northcoast, Plaintiff saw Maria Kostrzewski, M.D., for an initial evaluation. Tr. at 226-27. Dr. Kostrzewski observed that Plaintiff had adequate grooming and hygiene and was cooperative. Tr. at 227. Plaintiff's mood appeared euthymic, but his affect was very blunted. Tr. at 227. Plaintiff denied hallucinations or delusional beliefs since he started Risperdal one and a half years earlier. Tr. at 127. Plaintiff had an intact memory, organized and goal-directed thought processes, and good concentration. Tr. at 227. Dr. Kostrzewski assessed a GAF score of fifty.  Tr. at 227. At the next visit, in August of 2004, Dr. Kostrzewski opined that Plaintiff, who has enjoyed working part-time, had been stable for the last two years and should continue to take Risperdal 2mg. Tr. at 229. Through the remainder of 2004, Plaintiff denied psychotic, manic, depressive, or anxious symptoms. Tr. at 230-32.

In 2005, Dr. Kostrzewski continued to prescribe Risperdal 2mg. and noted that Plaintiff was either "stable," "very stable," or "doing well," on this medication. Tr. at 233-41. Plaintiff also reported doing very well,  Tr. at 234, 237, 238,  and observed that Risperdal worked very well for him. Tr. at 234, 241. He denied depression or racing thoughts. Tr. at 235. Dr. Kostrzewski

---

[4]A GAF score of fifty-one to sixty indicates some moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34.  In the same month that Dr. Hartley assessed a GAF score of sixty, Rose Lester, a social worker, assessed a GAF score of forty-five. Tr.at 307. However, in June 2003, Diann Hack, another social worker, assessed a GAF score of fifty-seven, Tr. at 340, consistent with Dr. Hartley's assessment.

encouraged Plaintiff to request permission to seek a better job and individual housing. Tr. at 237, but the judge concluded that Plaintiff was not ready for an apartment or full time work. Tr. at 238. On mental status examination, Plaintiff had adequate grooming and hygiene; was pleasant and cooperative; made good eye contact; had spontaneous speech with normal tone and volume; a euthymic or pleasant mood; congruent/appropriate affect; organized and goal-directed thought process; and an intact memory. Tr. at 233-41.

In 2006, Dr. Kostrzewski transferred Plaintiff to Siva Yechoor, M.D., for treatment. Tr. at 245. Dr. Yechoor stated that Plaintiff's bipolar disorder remained in remission while on Risperdal 2mg, which she recognized was less than the conventional dosage of the drug. Tr. at 245. Throughout the year, Dr. Yechoor continued to describe Plaintiff's bipolar disorder as being in remission.[5] Tr. at 225, 246-47, 250-52, 256. During sessions, Plaintiff maintained eye contact; appeared cooperative and positive; had a normal mood; a bright and reactive affect; normal thought process; normal thought content; and intact insight and judgment. Tr. at 225.

From late 2007 to early 2008, Dr. Yechoor continued to describe Plaintiff's bipolar disorder as "in remission." Tr. at 257-65. Plaintiff discussed joining a fitness center, Tr. at 258, traveling to Michigan to visit his mother, Tr. at 265, walking two miles a day, Tr. at 265, and receiving an award at work. Tr. at 265. Mental status examinations revealed good grooming; good eye contact; normal moods; appropriate/bright affect; normal speech; normal thought process; normal thought content; and intact judgment and insight. Tr. at 257-59, 261-65.

In March of 2008, Dr. Yechoor transferred Plaintiff to Victoria Kelly, M.D., for further outpatient management. Tr. at 265. On April 7, 2008, Dr. Kelly noted that Plaintiff has been on Risperdal 2mg since 2002, without any need to adjust the dosage, as he was doing well. Tr. at 268. Plaintiff reported that he enjoyed living in the group home and liked his job, which he hoped to be able to perform on a full-time basis. Tr. at 267. He characterized Risperdal as a "miracle drug." Tr. at 267. Although Plaintiff's conditional release was scheduled to terminate in 2010, he expressed interest in seeking early release.

---

[5]According to treatment notes dated October 27, 2006, Plaintiff had a "minor set-back" when he resumed drinking alcohol. Nonetheless, his bipolar disorder remained in remission. Tr. at 254-56.

Throughout 2008, Plaintiff continued to deny symptoms of depression or mania, Tr. at 270, 273, 275, 277. On examination, Dr. Kelly observed that Plaintiff had good grooming and hygiene; appeared pleasant and cooperative; maintained good eye contact; had normal speech; a "good" mood; a euthymic, reactive, and appropriate affect; a normal or tangential thought processes that was easily redirected; normal thought content, good to fair insight, judgment and impulse control; and fair concentration. Tr. at  267, 270, 272, 274, 276-77. Dr. Kelly further observed that his psychomotor movements were normal with the exception of an intermittent "slight" hand tremor, Tr. at 267, 270, 272, 274, 276, for which Plaintiff declined medication due to potential side effects. Tr. at  271.

Despite her findings, on October 2, 2008, Dr. Kelly wrote a "To Whom It May Concern" letter, in which she opined that Plaintiff is disabled. Tr. at 409. Dr. Kelly stated that even during periods of stability, Plaintiff exhibited "some symptoms of bipolar disorder." Tr. at 409. She further observed that his medication causes sedation.

In 2009, Dr. Kelly continued to prescribe Risperdal 2mg and Plaintiff remained stable. Tr. at 462-75.  Plaintiff also continued to deny symptoms of depression or mania. Tr. at 462, unnumbered page between 463 and 464, 465, 467, 469-70, 472, 474. Dr. Kelly observed that Plaintiff had good grooming and hygiene; a pleasant and cooperative attitude; normal speech; normal motor movements with the exception of the left-hand tremor; a "good" mood; a euthymic and reactive or restricted affect; normal thought processes; and fair insight, judgment, and impulse control.  Tr. at  462-65, 467, 469-70, 472, 474. Dr. Kelly noted only once that Plaintiff's concentration appeared erratic. Tr. at 472. Plaintiff began biking and reported more energy. Tr. at 467. Although Plaintiff expressed a desire to pursue a full-time car salesman job, Dr. Kelly expressed concern that Plaintiff would de-compensate if he worked sixty hours a week. Tr. unnumbered page between 463 and 464.

On January 27, 2011, Dr. Kelly completed a mental residual functional capacity assessment. She opined that Plaintiff had a moderate limitation in his ability to deal with detailed instructions, but no loss in the ability to carry out short simple instructions; Tr. at  497. She further opined that Plaintiff had only a slight limitation using judgment and no loss in the ability to follow work-related

-9-

decisions. Tr. at 497. With regard to responding to others and stress, she opined that Plaintiff had a marked/extreme limitation in responding to work stress, a moderate limitation in responding to changes in a routine work setting, and a slight limitation interacting with others. Tr. at 498. With regard to personal-social adjustments, she opined that Plaintiff had no loss in the ability to maintain his personal appearance and only a slight limitation in his ability to behave in an emotionally stable manner or to relate predictably in social situations Tr. at 498. Dr. Kelly did not respond to the inquiry regarding the amount of absenteeism that could be attributed to Plaintiff's mental limitations. She assigned a GAF score of sixty for the years 2008 and 2009. Tr. at 498. In reaching these conclusions, Dr. Kelly failed to reconcile her opinions with Plaintiff's consistent work record.

With respect to Plaintiff's physical limitations, Plaintiff saw Larry Johnson, M.D., for a physical examination in November of 2002. Tr. at 314. Plaintiff denied having musculoskeletal pain, had a normal gait and station, and could tiptoe, heel stand, and squat. His sensation and reflexes were also intact. One year later, in November of 2003, Plaintiff saw Robert Stierwalt, M.D., for a physical examination and again denied musculoskeletal pain. Tr. at 309. Plaintiff had a full range of motion of his thoracolumbar and cervical spine. He also had a stable gait, good motor strength in his arms and legs, intact sensation, and normal reflexes. Tr. at 318.

In November of 2008, Khalid Mahmood, M.D., conducted a consultative examination and observed that Plaintiff had normal muscle tone, muscle strength, reflexes, coordination, and gait. Tr. at 412, 449. Plaintiff had some difficulty bending and some tenderness in his low back. Tr. at 412. However, Plaintiff did not experience muscle spasms and had a normal range of motion in his cervical spine, shoulder, elbows, wrists, hands, fingers, hips, knees, and ankles. Tr. at 450-52. Although he had a resting tremor and mild cog wheeling in his left hand, his grasp, manipulation, pinch, and fine motor functioning appeared normal in both hands. Tr. at 412, 449.

Dr. Mahmood opined that Plaintiff's low back pain limited him to lifting no more than thirty pounds and that he had difficulty bending. Tr. at 412. Dr. Mahmood opined that Plaintiff could handle a part-time job, working three to four hours per day. Tr. at 412. It is important to note that Dr. Mahmood's conclusions appear to be based upon Plaintiff's own subjective statement that he

-10-

could only lift thirty pounds, and could work only three to four hours daily, as a result of a back injury in 1999. Tr. at 411.

On January 20, 2009, x-rays of Plaintiff's lumbar spine revealed L2 and L4 compression deformities of an undetermined age, and some degenerative changes.  Tr. at 439.  Plaintiff presented to Neighborhood Health Associates for routine care between September of 2004 and May of 2011. Tr. at 392-407, 413-21, 601-50. Over the course of six years and eight months, Plaintiff complained of back pain or spasms only three times. Tr. at 609, 615, 617.

### B.  State agency assessments

In September of 2008, William Benniger, Ph.D, opined that Plaintiff could perform work that involved a set routine with simple tasks and no strict time frames or production demands.  Tr. at 390. In December of 2008 and May of 2009, two additional state agency psychologists concurred with Dr. Benniger's findings. Tr. at 435-36, 454-57. No state agency psychologist opined that Plaintiff met or equaled a listed impairment.  Tr. at 373-86, 432, 459.

On December 1, 2008, Jessica Tinianow, M.D., undertook a review of Plaintiff's file on behalf of the agency and limited Plaintiff to light work with occasional handling and fingering with the left hand. Tr. at 423-27. However, Michael Colandrea, M.D., who reviewed Dr. Tinianow's assessment, noted that insufficient evidence existed to assess the severity of Plaintiff's back pain and that Dr. Tinianow's manipulative limitations were incorrect as Dr. Mahmood found Plaintiff could handle normally. Tr. at 437.

On February 19, 2009, Ronald Cantor, M.D., an agency file-reviewing physician, opined that Plaintiff could perform a range of medium work with occasional fingering with the left hand. Tr. at 440-46, 453, 458. Dr. Cantor rejected Dr. Mahmood's findings and stated that he did not provide a true medical source statement, but, instead, only repeated Plaintiff's subjective statements. Tr. at 446.  In May of 2009, Anton Freihofner, M.D., concurred with Dr. Cantor's assessment. Tr. at 460.

A file review was undertaken by Jennifer Swain, Psy.D. on May 19, 2009.  Tr. at 454-456. She concluded that Plaintiff was moderately limited in his ability to sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruption from psychologically based symptoms, perform at a consistent pace without an unreasonable number and

-11-

length of rest breaks, and respond to changes in the work setting.  Tr. at 454-455. Dr. Swain observed that "[Plaintiff] may have some problems adjusting to a less structured routine once he is off court supervision, but he has shown he can handle a set routine with simple tasks where he faces no strict time or production demands."  Tr. at 456.

### C.    Hearing testimony

At the hearing, Plaintiff testified that he was still residing in the group home.  Tr. at 697. Plaintiff explained that staff members cook meals and distribute medication, but that he may "come and go" as he pleases, with the exception of curfew.  Tr. at 697.  Four people reside in the home and the household chores are divided between them. Tr. at 697-698.  Plaintiff has a driver's license and has no difficulty driving.  Tr. at 698. Plaintiff explained that his conditional release was scheduled to terminate on October 6, 2012.  Tr. at 700.

As of the date of the hearing, Plaintiff was still performing janitorial work three days per week, eight hours per day.  Tr. at 699.   He testified that he cleans the hallways of apartment buildings, which included sweeping, mopping, and cleaning windows.  Tr. at 701.  Plaintiff lifts a maximum of thirty pounds on a regular basis. He testified that he could lift a maximum of fifty pounds. Plaintiff has difficulty standing for more than four hours,  but has no limitations on his ability to walk or sit.  Tr. at 704.  He testified that he has no difficulty using his hands and he gets along well with people.  Tr. at 705.  Plaintiff testified that he would like to work more hours per week, at least one additional day if the work was available.  Tr. at 700.  He cited the work program as the reason he is limited to part-time work. Tr. at 703.

Plaintiff testified that he goes to restaurants, exercises at a fitness club, and walks in the park. Tr. at 708. He has friends with whom he enjoys spending time. When he was asked to identify a stress-inducing situation, Plaintiff spoke of his children, who he has not seen for years.  Tr. at 707-708. Later in his testimony, Plaintiff explained that he was given additional responsibility the previous summer of driving the work truck and acting as crew leader, which caused him significant stress.  Tr. at 713-714.  He testified that he made wrong turns and went through stop lights.  Tr. at 714.  Plaintiff testified that he struggled with the additional responsibility because he was accustomed to doing the same thing for seven years.  Tr. at 715.

-12-

Before taking Risperdal, Plaintiff struggled with mania, but did not experience depression. Plaintiff further testified that he has not experienced a manic episode since 2002.  Tr. at 707.  At the hearing, he testified that he is still prescribed Risperdal, 2 mg. per day.  Tr. at 711. He experiences side effects, including weight gain, sexual side effects, and his left hand shakes.  Tr. at 711-712. Plaintiff testified that he is right-handed, and that he uses his right hand "mostly" with his job, except for mopping. Tr. at 712.  Plaintiff testified that he sleeps well and has "pretty good" attention and concentration. Tr. at 713.

Plaintiff testified that fifteen years of his prior work experience was in car sales, and, prior to working at dealerships, he performed factory work for twelve and a half years.  Tr. at 702. Plaintiff further testified that he laid his motorcycle on its side in 2000, and when it began leaking oil he raised it "crush[ing his] vertebraes."  Tr. at 716-717.  Plaintiff testified that he suffers muscle spasms and cannot stand "so much." Tr. a717.

### D.    The ALJ's decision

In the Decision, the ALJ declined to give controlling weight to Dr. Kelly's conclusion that Plaintiff could not perform full-time work.  First, the ALJ acknowledged that Plaintiff's ability to work is an issue reserved for determination by the Commissioner.   Next, the ALJ observed that "[Dr. Kelly's] own reports fail to reveal the type of significant clinical findings or abnormalities one would expect if the claimant were in fact disabled.  Rather, her progress notes . . .consistently indicate that [Plaintiff] had no side effects from is medications, aside from his observed tremor which has been accounted for in the residual functional capacity. [Plaintiff] never reported feeling sedated nor had [Dr. Kelly] addressed this particular issue as reflected in her progress notes."  Tr. at 30.

The ALJ specifically addressed an incident in the summer of 2010 when Plaintiff was promoted to crew leader at work.  Plaintiff became increasingly agitated and expressed concerns about the additional responsibility.  The ALJ also specifically addressed Dr. Kelly's attempts to dissuade Plaintiff from seeking a sales position at a car dealership in the future.  In both instances, the ALJ recognized that  Dr. Kelly correctly forecasted that Plaintiff would de-compensate under the pressure of increased responsibility. As a consequence, the ALJ limited Plaintiff's residual

-13-

functional capacity to low stress positions with an SVP of 1 to 2.  She further relied on Plaintiff's consistent work record in declining to afford controlling weight to Dr. Kelly's opinion that Plaintiff was unable to perform full-time work.

### E.      Plaintiff's arguments

Plaintiff advances three arguments in this appeal.  First he contends that he meets a Listing based upon his bipolar disorder and his conditional release to the group home.  Second, Plaintiff argues that the ALJ erred in formulating his RFC, because he did not include any lifting limitation based upon Plaintiff's back problems and he concluded that Plaintiff can frequently finger with his left hand.  Finally, Plaintiff contends that the ALJ violated the treating physician rule when he gave little weight to the opinion of Dr. Kelly.

In his first argument, Plaintiff asserts that he meets the criteria of Part "B" and Part "C" of Listing 12.04, captioned "Affective Disorders," based upon his bipolar disorder and the fact that he resides in a group home pursuant to a court order.   Listing 12.04 reads, in its entirety:

> Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or

-14-

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

First, Plaintiff argues that he meets the Part "B" criteria.  Plaintiff contends that he is markedly limited in his activities of daily living based upon "references to his grooming being less than optimal."  ECF Dkt. #13 at p. 14.  To the contrary, the record is replete with references to Plaintiff's ability to engage in house cleaning chores, to manage his daily work and recreation, and to maintain his appearance.  Next, Plaintiff relies upon his hospitalization at Northcoast to show an episode of decompensation.  However, Plaintiff must show repeated episodes of decompensation, and he conceded at the hearing that his last manic episode occurred in 2002.

Next, Plaintiff contends that he meets the Part "C" criteria because he has lived in the group home for the better part of the time period at issue for disability.  Plaintiff 's argument is predicated upon the conclusion that the group home is a highly supported living arrangement.  Neither party has cited any case law defining a "highly supported living arrangement," and both parties concede that the unique facts of this case present a matter of first impression.  Although Plaintiff's meals are prepared and his medication is distributed by an employee of the group home, he is otherwise without supervision.  Plaintiff testified that he may come and go as he pleases (with the exception of an evening curfew), and that he engages in many off-site activities, including work, going to restaurants, the fitness center, movies, and the park.

Plaintiff cites *Koch v.Astrue*, 2011 WL 1119759 (N.D.Ohio), where the undersigned concluded that remand was necessary in order to allow the ALJ to consider whether a claimant who relies upon a third-party to maintain compliance with prescribed medication is subject to a "highly structured setting."  *Id.* at *5.  However, the above-captioned case is factually distinguishable from *Koch, supra*.  In *Koch*, the ALJ's Decision was largely predicated upon Plaintiff's failure to follow his prescribed treatment.  Although Plaintiff's medication is distributed by an employee of the group home, there is not a single instance in the record where Plaintiff has failed to comply with his prescribed treatment.  Accordingly, the facts in *Koch* make the case inapposite here.

Accordingly, the undersigned recommends that the Court find that the group home does not constitute a "highly supportive living arrangement."  Because Plaintiff has not demonstrated that he

-16-

meets the "B" or "C" criteria of Listing 12.04, the undersigned recommends that the Court find that the ALJ's decision that Plaintiff did not meet or equal a listing is supported by substantial evidence.

Next, Plaintiff argues that the ALJ erred in formulating his RFC, when he included no lifting limitation and concluded that Plaintiff was capable of frequent fingering with his left hand. Plaintiff relies upon the opinion of Dr. Mahmood to establish that the ALJ should have included a lifting limitation due to Plaintiff's ongoing back pain. Dr. Mahmood wrote, "He can lift up to [thirty] pounds weight. He says he can work up to [three] or [four] hours daily." Tr. at 411.

The ALJ gave no weight to the opinion of Dr. Mahmood, because the ALJ believed that Dr. Mahmood merely parroted Plaintiff's assessment of his back problem. The ALJ wrote, "Likewise, no weight is accorded Dr. Mahmood's opinion as he did not really give a medical source statement. He merely repeated what [Plaintiff] had reported, namely that he could lift [thirty] pounds and could handle a part-time job. Tr. at 31. Moreover, at the hearing, Plaintiff testified that he worked an eight-hour day, commonly lifted thirty pounds at work, and could lift a maximum of fifty pounds. Accordingly, the ALJ did not err in including no lifting limitations in the RFC.

Plaintiff also asserts that the RFC should have reflected his ability to occasionally, rather than frequently, finger with the left hand. Plaintiff predicates his argument on the opinions of two agency file-reviewing physicians, who concluded that Plaintiff is only capable of occasional fingering with his left hand. However, substantial evidence in the record supports the ALJ's decision to limit Plaintiff to frequent fingering with the left hand. Plaintiff conceded at the hearing that his hand tremor does not occur daily. Tr. at 712. In fact, Plaintiff did not even notice the left hand tremor until Dr. Kelly identified it. Tr. at 165. Moreover, Dr. Mahmood, who examined Plaintiff, concluded that Plaintiff's grasp, manipulation, pinch, and fine motor functioning remained normal in both hands. Tr. at 412, 449. Finally, since June of 2004, Plaintiff worked as a janitor, Tr. at 699, which requires him to handle small objects for seven hours in a work day. Tr. at 150.

Having considered Plaintiff's arguments regarding the RFC, the undersigned recommends that the Court find that substantial evidence supports the ALJ's conclusions that Plaintiff requires no lifting limitation and is capable of frequent fingering with the left hand. However, *assuming arguendo* that the ALJ should have limited Plaintiff to occasional fingering with the left hand,

Plaintiff cannot show that he is disabled because the occupation of cleaner only requires occasional fingering. See DOT 381.687-018, 1991 WL 673258. Thus, if Plaintiff were limited to occasional fingering, as he argues, he could still perform a significant number of jobs because the VE identified 10,000 cleaner jobs in Ohio and 100,000 cleaning jobs nationally.[6]  Tr. at 720-21.  Accordingly, the undersigned recommends that the Court find that the ALJ did not err in formulating the RFC in this case, or in the event that she did, Plaintiff still cannot demonstrate that he is disabled.

In his final argument, Plaintiff contends that the ALJ erred in not giving controlling weight to the opinion of Dr. Kelly.  An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

---

[6]In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), the Sixth Circuit found that 1,350 positions constituted a significant numbers of jobs in local and national economy.  See also *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248, at *4 (6th Cir. June 6, 1990), cited in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)(125 jobs in local geographic area and 400,000 jobs nationwide constituted "significant number of jobs" within the meaning of 42 U.S.C. § 423(d)(2)(A)).  More recently, in *Nejat v. Comm'r of Soc. Sec.,* 359 F.App'x 574 (6th Cir. 2009), the Sixth Circuit found that "the ALJ's count of 2,000 jobs [for one position] available in the third category withstands Nejat's challenge." *Id.* at 579; see also *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) ("870 jobs can constitute a significant number in the geographic region.").

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377.

Simply stated, Dr. Kelly's conclusions regarding Plaintiff's marked limitation in his ability to respond to work stress and to perform full time work are not supported by the record, including her own treatment notes. The treatment notes in the record from Plaintiff's various treating

-19-

physicians, during both his confinement at Northcoast and his conditional release to the group home, reflect that Plaintiff was able to perform his daily life activities and his part-time work, without exacerbation of his bipolar disorder.  While it is true that Plaintiff struggled when he was given a supervisory role at work, the ALJ accommodated Plaintiff's limitations predicated upon stress when she limited Plaintiff to low stress work.  But for that single instance, when Plaintiff's responsibilities were dramatically increased, Dr. Kelly's notes do not document any problems at Plaintiff's place of employment.

Next, Dr. Kelly rested her conclusion that Plaintiff was disabled from competitive employment because his medication caused sedation. However, throughout Plaintiff's treatment, Dr. Kelly never documented any complaints by Plaintiff of difficulty arriving for work in a timely fashion or performing his work due to side effects of his medication.  In fact, Plaintiff did not include sedation in the list of side effects he experiences from his medication.  He testified that he sleeps well, does not nap during the day, and engages in an active lifestyle.

Of equal import, Plaintiff faced several difficult emotional challenges during his conditional release, including problems with his son (who suffers from the same disorder and was an active drug abuser), the departure of a friend that he characterized as his support system who moved to another state, and the repeated disappointment of being denied early release.  Despite these challenges, Dr. Kelly never noted that Plaintiff regressed or lost sight of the structure required to maintain his mental health.  Dr. Swain acknowledged that Plaintiff "appears to have improved insight into his need for mental health [treatment] and abstinence from illicit substances, choosing to avoid contact with son who is an active abuser." Tr. at 456.  Although Dr. Kelly noted that Plaintiff was "quite anxious and agitated and could not sleep" after hearing that his disability award was being rescinded and that he would have to repay approximately $3,000.00 in benefits, she later noted that Plaintiff was in a better mood after being notified that he would not have to repay the benefits.  Tr. at 467, 469.  Consequently, the undersigned recommends that the Court find that the ALJ did not err in giving little weight to the opinion of Dr. Kelly, insofar as her treatment notes do not support the extreme limitations attributed to Plaintiff.

-20-

**VI.    CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's

decision and DISMISS Plaintiff's complaint with prejudice.

DATE: February 19, 2014

    <i>/s/George J. Limbert</i>

GEORGE J. LIMBERT

UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).